TAHARQA DEAN,                          Civil Action No. 17-7344

             Plaintiff,

                                       **OPINION**

      v.

BOROUGH OF GLASSBORO, et al.,

             Defendants.

**APPEARANCES:**

STANLEY O. KING
KING & KING, ESQS.
231 SOUTH BROAD STREET
WOODBURY, NEW JERSEY 08096

        *On behalf of Plaintiff*

A. MICHAEL BARKER
TODD J. GELFAND
BARKER, GELFAN & JAMES
 LINWOOD GREENE
210 NEW ROAD - SUITE 12
LINWOOD, NJ 08221

        *On behalf of Defendants*

**HILLMAN**, District Judge

      Before the Court is Defendant Michael Fanfarillo ("Officer

Fanfarillo"), Kyle Snyder ("Officer Snyder"), George Moore

("Officer Moore"), Dominic Visceglia ("Officer Visceglia"),

Barry Gray ("Officer Gray") (collectively "Individual

Defendants" or the "Officer(s)"), Police Chief Alex Fanfarillo

("Chief Fanfarillo"), and the Borough of Glassboro's

("Glassboro")(collectively "Defendants") Motion for Summary Judgment.  As set forth below, the Court will grant, in part, and deny, in part, Defendants' Motion for Summary Judgment.

## BACKGROUND

This case concerns the alleged use of excessive force on and false arrest of Plaintiff, Taharqa Dean ("Plaintiff").  This Court has before it video evidence capturing Defendants' encounters with Plaintiff.[1]

### 1. First Encounter with Plaintiff

On September 23, 2015, Officer Fanfarillo responded to a report of a man lying on the ground having a seizure.  Officer Snyder was also dispatched to the same location for a medical call.  After assessing the scene, Officer Snyder testified he had no reason to believe Plaintiff was involved in criminal activity.  Officer Fanfarillo observed Plaintiff lying face down on the ground semi-conscious, sweating profusely, breathing heavily, and severely disoriented.  Officer Snyder told Plaintiff to "focus on your breathing alright bud" and that help

---

[1] The facts as depicted in the videotape are included because the video is part of the record and, therefore, the Court must rely on the video in ruling on summary judgment.  See Scott v. Harris, 550 U.S. 372, 381 (2007) (finding that the Court of Appeals "should have viewed the facts in the light depicted by the videotape"); Ference v. Township of Hamilton, 538 F. Supp. 2d 785, 789 (D.N.J. 2008)("The videotape is also likely the best available evidence of the events at issue in this case. Thus, the videotape will be considered as part of the record.").

was on the way.  Officer Fanfarillo asked the bystanders if they knew Plaintiff's name and explained "I have actually talked to him before. He has told me he has seizures."  Soon thereafter, emergency medical technicians ("EMT") Thomas Lamond ("EMT Lamond") and Jennifer Boos ("EMT Boos") arrived at the scene and a decision was made to transport Plaintiff to the hospital.

The EMTs rolled Plaintiff over and stated "hey hey" in response to Plaintiff's attempts to get up and asked Plaintiff to remain sitting down.  The Officers and EMTs placed their hands on Plaintiff's shoulder to keep Plaintiff from standing up and repeatedly stated "it is okay," "don't worry about it," and asked Plaintiff to "relax."  Officer Fanfarillo reminded Plaintiff that the two of them have talked before and that they knew each other.  The EMTs informed Plaintiff that he recently experienced a seizure and Officer Snyder notified him that "it is okay bud."

Eventually, the Officers helped the EMTs place Plaintiff on the stretcher and strapped him in.  Officer Snyder again explained "it is alright man don't worry about it."  Officer Fanfarillo then asked about Plaintiff's identification and explained he remembered Plaintiff's name started with a D.  The EMTs and Officers then identified Plaintiff through a check EMT Lamond found in Plaintiff's pocket.  Officer Fanfarillo confirmed that Plaintiff's name was Dean and explained to the

EMTs that Plaintiff has lived in this area for about a year.

Officer Snyder then explained to the EMTs that he thought someone saw Plaintiff have a seizure, that he fell on the ground, and that when Officer Snyder arrived at the scene Plaintiff was already on the ground.  The EMTs attempted to hook Plaintiff up to oxygen but he shook his head when they attempted to place the oxygen up his nose.  During this time, Officer Snyder explained to Plaintiff that the EMTs are "going to put some oxygen on" him.  EMT Boos then told EMT Lamond to not worry about it because he was breathing, to which Officer Snyder responded, "he is breathing pretty good" to which the EMTs agreed.  The EMTs then loaded Plaintiff onto the ambulance. Plaintiff did not speak during this first encounter with the Officers.

### 2. Second Encounter with Plaintiff

After Plaintiff was placed into the ambulance for transport, the Officers were called back to the scene by 911 for "an assault" and were informed Plaintiff was combative and kicking and biting an EMT.  Officer Snyder testified that this second call "was a different type of call" than the first one. More specifically, Officer Snyder testified, "I didn't know what was going on. We got a call, came back, I put myself in a tactical position to either have to prevent any type of previous as reported combativeness toward EMT personnel or assist with

4

whatever was needed to be assisted with."

Once back at the scene, Officer Fanfarillo opened the rear door of the ambulance and found Plaintiff standing alone in the ambulance with straps around his legs and standing next to the stretcher. Officer Fanfarillo explained to Plaintiff that he has "got to lay down" and "Mr. Dean lay down man come on." Officer Fanfarillo then stepped into the ambulance, walked towards Plaintiff, and placed his hand on Plaintiff's arm explaining that he needed to lie down and guiding him back to the seated position on the stretcher. Officer Fanfarillo then said to Plaintiff "we talked before and we were on good terms, me and you…. You have an issue going on alright? You're having a seizure… I just want to help you. Nobody wants to hurt you…. I know what happened in the past but it ain't happening now, alright? We good? We gonna let them help you a little bit?"

Plaintiff did not response to Officer Fanfarillo, started breathing heavily, looked side to side, and then tried to lie his head down. Officer Fanfarillo then radioed "we're ok here" to communications. Officer Fanfarillo began to remove the leg stretcher straps from Plaintiff while EMT Boos asked "what's your name bud?" Plaintiff failed to respond. Around this time, Officer Snyder entered the ambulance from the front and joined Plaintiff and Officer Fanfarillo in the back of the ambulance. Plaintiff then stood up and attempted to pull his pants up which

had fallen down perhaps in an attempt to remove himself from the straps holding him to the stretcher.  Officer Snyder told Plaintiff to "have a seat back down bud" and then Officer Fanfarillo asked the EMTS "he can't refuse at this point can he?" Plaintiff tugged at his pants for approximately two minutes.

During this time, Officer Snyder asked Plaintiff if he was alright and EMT Boos explained "you had a seizure sir" and that "someone saw you seizing on the side of the road."  The Officers asked if he was okay and said they were here to help explaining "we're here to help, we're going to go to the hospital, you ok with that?"  EMT Boos then asked "does anything hurt you?" and "can you tell us your name?"  Plaintiff was completely unresponsive and non-communicative during this entire time despite repeated attempts to engage him in conversation.

As EMT Boos asked Plaintiff "do you know what happened?" Plaintiff started to walk towards the back of the ambulance despite continuing instructions from the Officers to sit back down.  Plaintiff then attempted to step his right foot off the ambulance onto a rear step, but hesitated placing his foot back on the floor inside the ambulance.  Suddenly, Plaintiff's left leg extended outside of the ambulance contacting Officer Fanfarillo.  It is unclear whether Plaintiff simply misperceived the distance to the ground and used his extended leg to brace

his fall or intentionally kicked Office Fanfarillo.

In any event, Plaintiff was soon on the pavement behind the ambulance.  Once on the ground, the following exchange between Officer Fanfarillo and Plaintiff occurs:

Officer Fanfarillo: What you're gonna fucking bite me for? What you gonna bite me for?

Plaintiff: I didn't man!

Officer Fanfarillo: I talked to you like a person, treating you normal

Plaintiff: Fuck off man.

The Officers attempted to turn Plaintiff onto his stomach in order to handcuff him.  The Officers repeatedly said "relax" to which Plaintiff says "alright."  Plaintiff then started to scream out "my leg," "Alright! Alright! Alright!"  The Officers asked Plaintiff to give them his right arm and told him to stop resisting.  Plaintiff continued to say "alright" and scream.  As they continued to attempt to place handcuffs on Plaintiff, Officer Snyder can be heard saying "he's biting."  Defendants contend that at this stage of the altercation the video depicts Plaintiff grabbing Officer Snyder's gun.  The Court is unable to conclude that assertion is an uncontestable fact.  Viewing the evidence in the light most favorable to the Plaintiff, the video does not clearly depict Plaintiff's hand on Officer Snyder's

gun.

As the Officers and Plaintiff continue to grapple, the
Plaintiff was warned a few times that he was going to get pepper
sprayed.  Officer Snyder told Officer Fanfarillo to back up
because he was going to spray Plaintiff.  From the video it is
not clear when the Officers were able to successfully handcuff
Plaintiff; however, it is depicted that once Officer Snyder
pepper sprayed Plaintiff, he turned over and his hands were
already handcuffed.

At this point the Officers disengaged; however, Plaintiff
started to harm himself by banging his head against the curb.
Other Officers Visceglia, Officer Gray, and Officer Moore
arrived at the scene and moved Plaintiff away from the curb.  On
the video, Plaintiff is clearly agitated, belligerent, and
vocal.  The Officers redouble their efforts to further
physically restrain and control Plaintiff who remained
handcuffed, a process that took several minutes.  Defendants
allege Plaintiff can be heard screaming "die, die, die," which
Plaintiff disputes, contending he was merely calling out "John,
John" his father's name.  It is unclear from the video whether,
on the one hand, Plaintiff's obvious distress was caused by the
continuing efforts to restrain him, or, on the other hand,
whether the Officers were acting reasonably in reaction to
Plaintiff's continuing resistance to those same efforts.

Whatever may be cause or effect, the process of eventually
restraining Plaintiff plays out over a prolonged period.  The
Officers turn Plaintiff's body over face down on the pavement
and several officers kneel and place their body weight on
various parts of his legs and backside while efforts are made to
tie and bind his ankles.  One officer bends Plaintiff's cuffed
hands and into a cross position on his back.  During this time,
an Officer explained that Plaintiff bit him, the wound visible
on the video, and another Officer asked if Plaintiff was having
seizures.  Plaintiff is eventually given a shot of ketamine, a
tranquilizer, in the torso.

As the Officers awaited the effects of the ketamine they
continue their efforts to restrain Plaintiff.  Officer
Fanfarillo's body camera footage shows a second Officer
continuing to place his weight into Plaintiff's back while
another Officer places his body weight into other parts of
Plaintiff's body.  The Officers then locked Plaintiff's
handcuffs.  Almost two minutes after Plaintiff received his shot
of ketamine, one Officer twisted Plaintiff's arm even further
back (in a wrist lock) at the same time two Officers are still
pushing their weight into his back and legs.  During this time,
Plaintiff continued to scream and attempted to move his hands
while officers continued their commands to Plaintiff to calm
down and that they would get off of him when he did so.

Over the next minute and half Plaintiff, bound at the hands and feet and face down on the pavement with the Officers still pressing their body weight into him, appears to calm down when the EMT and Officers realize he has apparently stopped breathing. EMT Boos orders "some oxygen on him" because "he is not breathing" which the officers appear to acknowledge or at least repeat. EMT Boos instructed the Officers to "roll him over because he is not breathing now." The Officers then rolled Plaintiff onto his back while Plaintiff was hooked up to oxygen. An officer uncuffs him. Soon thereafter, EMT Boos observed "he's breathing more now" and Plaintiff was then loaded onto a stretcher and placed into the ambulance. In sum, from the time the Plaintiff was handcuffed, laid face down, and had his ankles secured, approximately six minutes passed with Officers collectively pressing their body weight into the Plaintiff's body until he stopped breathing on his own.

Plaintiff was then taken to Cooper Trauma Unit for treatment, and then transferred to the Gloucester County Sheriff's Office. Plaintiff suffered lacerations to his head, cuts, abrasions, and sustained pinched nerves and bulging discs in the neck and lower back, nerve damage in both wrists, a groin injury, and aggravation of a prior rotator cuff injury, which required surgery. Plaintiff was hospitalized at Cooper for approximately a week and a half during which time his wrists and

ankles were handcuffed to the bed.

As a result of the foregoing actions, Plaintiff filed suit against Defendants asserting the following causes of action: (1) Count I – Excessive Force under 42 U.S.C. § 1983; (2) Count II – False Arrest/False Imprisonment under 42 U.S.C. § 1983; (3) Count III – Failure to Intervene under 42 U.S.C. § 1983; (4) Count IV – Monell and Supervisory Liability under 42 U.S.C. § 1983; (5) Count V – Civil Rights Conspiracy under 42 U.S.C. § 1983; (6) Count VI – New Jersey Civil Rights Act; (7) Count VII – Common Law Assault and Battery; (8) Count VIII – Common Law False Arrest and False Imprisonment; (9) Count IX – Common Law Negligence; and (10) Count X – Common Law "Pendent" Claim for Gross Negligence.[2]  On November 9, 2020, Defendants filed a Motion for Summary Judgment.  The Motion has been fully briefed and is ripe for adjudication.[3]

---

[2] In Plaintiff's Response to Defendants' Statement of Undisputed Facts, Plaintiff admits these are the only causes of actions asserted against Defendants.  The Court is unsure why Defendants provide arguments in their Reply Brief in support of dismissing a malicious prosecution claim that Plaintiff does not assert. Accordingly, the Court will not address the arguments regarding a malicious prosecution claim.

[3] In response to Defendants' Motion for Summary Judgment, Plaintiff consented to the dismissal of the following claims and/or remedies: (1) civil rights conspiracy; (2) common law torts; and (3) punitive damages against Glassboro only. Accordingly, Defendants' Motion for Summary Judgment is granted to the extent it seeks dismissal of Plaintiff's civil rights conspiracy claims, common law torts claims, and Plaintiff's request of relief in the form of punitive damages against

**DISCUSSION**

**A. Subject Matter Jurisdiction**

The Court has original federal question jurisdiction over Plaintiff's federal claims under 28 U.S.C. 1331, and has supplemental jurisdiction over the New Jersey state law claims pursuant to 28 U.S.C. 1367(a).

**B. Legal Standard for Summary Judgment**

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence;

---

Glassboro.

instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

However, the Supreme Court has instructed that, in qualified immunity cases, the existence of a videotape recording presents an "added wrinkle" to the general standard requiring the court to construe facts in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007). In that regard, "[w]here there is a video recording of the relevant events, the Court views the facts as depicted in the recording, rather than in the non-movant's favor, whenever the recording 'blatantly contradict[s]' the non-movant's version such that 'no reasonable jury could believe it.'" Knight v. Walton, 660 F. App'x 110, 112 (3d Cir. 2016) (quoting Scott, 550 U.S. at 380-81).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id. Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving

party.  Anderson, 477 U.S. at 256-57.  A party opposing summary

judgment must do more than just rest upon mere allegations,

general denials, or vague statements.  Saldana v. Kmart Corp.,

260 F.3d 228, 232, 43 V.I. 361 (3d Cir. 2001).

### C. Analysis

Plaintiff has brought his claims for excessive force,

failure to intervene, and false arrest/false imprisonment

pursuant to both 42 U.S.C. 1983 and the New Jersey Civil Rights

Act ("NJCRA").  Section 1983 is not a source of substantive

rights, but provides a vehicle for vindicating the violation of

other federal rights.  Graham v. Connor, 490 U.S. 386, 393-94

(1989). Section 1983 provides in relevant part:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of
> any State or Territory ... subjects, or causes
> to be subjected, any citizen of the United
> States or other person within the jurisdiction
> thereof to the deprivation of any rights,
> privileges, or immunities secured by the
> Constitution and laws, shall be liable to the
> party injured in an action at law, suit in
> equity, or other proper proceeding for redress
> . . . .

To state a claim for relief under § 1983, a plaintiff must

allege the violation of a right secured by the Constitution or

laws of the United States, and that the alleged deprivation was

committed or caused by a person acting under color of state law.

West v. Atkins, 487 U.S. 42, 48 (1988); Piecknick v.

Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994).  The NJCRA,

14

N.J.S.A. 10:6-1 et seq., was modeled after § 1983 and creates a state law cause of action for violation of an individual's federal and state constitutional rights.  Owens v. Feigin, 194 N.J. 607 (N.J. 2008).  "The NJCRA is interpreted analogously to § 1983."  Alexander v. Borough of Pine Hill, No. 17-6418, 2020 U.S. Dist. LEXIS 215661, at *13 (D.N.J. Nov. 18, 2020) (citing Norman v. Haddon Township, No. 14-cv-06034-NLH-JS, 2017 U.S. Dist. LEXIS 100707 (D.N.J. 2017)).

The doctrine of qualified immunity provides that "government officials performing discretionary functions . . . are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Thus, government officials are immune from suit in their individual capacities unless, "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the objectionable conduct.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Courts may exercise discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).

This doctrine "balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably" and it "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  Id. (internal quotation omitted).  Properly applied, qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'"  Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Here, Plaintiff alleges Defendants violated his constitutional rights in using excessive force, falsely arresting/imprisoning him, and failing to intervene.  Moreover, Plaintiff asserts Monell and supervisory liability claims against Glassboro and Chief Fanfarillo.

### a. False Arrest and False Imprisonment

Defendants argue the community caretaking doctrine defeats Plaintiff's false arrest claims because the Officers arrested Plaintiff, who was in need of medical attention, to prevent danger to Plaintiff, the Officers, and EMTs.  Plaintiff responds that the community caretaking doctrine is inapplicable under the facts of this case because the Officers were responding to the second call for an "assault" and "combativeness," which

16

indicates the response to the scene was for a law enforcement
purpose.  Plaintiff further argues that the failure of the
Officers to obtain approval from a medical control physician
before seizing Plaintiff is inconsistent with application of the
community caretaking doctrine.  On this issue, this Court agrees
with Defendants.

The community caretaking doctrine "is an exception to the
warrant requirement of the Fourth Amendment and allows police
with a non-law enforcement purpose to seize or search a person
or property 'in order to ensure the safety of the public and/or
the individual, regardless of any suspected criminal activity.'"
Vargas v. City of Philadelphia, 783 F.3d 962, 971 (3d Cir. 2015)
(quoting United States v. King, 990 F.2d 1552, 1560 (10th Cir.
1993)).  In Vargas, the plaintiff dialed 911 to seek emergency
assistance for her daughter's asthma attack.  Id., 783 F.3d at
966.  While waiting for paramedics to arrive, the plaintiff and
other individuals placed the plaintiff's daughter in a vehicle
and prepared to take the daughter to the hospital themselves.
Id.  Police officers, responding to a report of screaming
individuals, allegedly positioned their vehicle so that it
blocked the plaintiff's vehicle.  Id.  The officers reportedly
ordered everyone out of the vehicle and knowing an ambulance was
nearby, instructed the plaintiff and the others to wait for the
paramedics.  Id. at 967.  The plaintiff claimed that the

officers unreasonably seized her in violation of the Fourth
Amendment.  Id. at 968.

The Third Circuit held that "the community caretaking
doctrine can apply in situations when . . . a person outside of
a home has been seized for a non-investigatory purpose and to
protect that individual or the community at large."  Id. at 972.
The Vargas court agreed with the defendants' argument that even
if there was a seizure, it was reasonable under the community
caretaking doctrine.  The Third Circuit held:

> The undisputed facts show that the actions of
> [the officers] were reasonable.  They were
> responding to a volatile situation which they
> did not initially know involved a medical
> emergency, and any brief seizure that may have
> occurred was a result of the officers' concern
> for the safety of everyone involved. . . .
> Once the officers realized [the plaintiff's
> daughter] needed medical attention, it was
> reasonable for them to direct [the plaintiff]
> to wait because an ambulance was within
> earshot and its arrival was apparently
> imminent.

Here, similar to the officers in Vargas, even viewed in the
light most favorable to Plaintiff, the body camera footage
demonstrates conclusively that the Defendants' initial focus was
the concern for the safety of Plaintiff as well as the others
around him.  As depicted on the video, Plaintiff attempted to
exit the ambulance after repeatedly being told in a benevolent
tone and professional manner that he was in need of medical
care.  His response was to ignore their reasonable directions

and to give no verbal response whatsoever to the Officers and EMTs at the scene endeavoring to help him. The Officers were aware he had previously experienced a seizure, appeared continuously disorientated during the encounter with the Officers, and had reason to believe that minutes before he had kicked and bit EMT Lamond, who was attempting to provide him with medical assistance.

The events depicted in the video confirm the applicability to the community caretaking doctrine to the Defendant Officers' initial seizure of the Plaintiff in light of the uncontested and uncontestable events depicted in the body worn camera video. It would not have been proper for the Defendants to essentially allow Plaintiff to leave and walk away while in the middle of what any reasonable person would view as a medical emergency. Such actions could put the public in danger as well as Plaintiff himself. The fact that Plaintiff was later charged with offenses related to the struggle with the Officers attempting to subdue Plaintiff does not mean the initial seizure of Plaintiff is not governed the community caretaking doctrine.

The Court finds Plaintiff's reliance on cases where there were questions of fact regarding whether the initial stop of Plaintiff was a pretext to investigate suspected criminal activity unpersuasive. As detailed above, the body camera footage clearly depicts the Officers arrived at the scene in an

attempt to calm a volatile situation, called in a all-clear soon
after they arrived, and went about a concerted effort to protect
the Plaintiff from harming himself and others first by
encouraging him to agree to EMT transport and then forcing the
issue when he refused to comply.

Moreover, the Court finds the Plaintiff's argument
meritless that the Officers should have received approval from a
medical control physician before seizing Plaintiff.  The
Officers were responding to a situation where they received
information that the Plaintiff has already bit and kicked EMT
Lamond.  While the officers were clearly not coming back to the
scene to arrest Plaintiff for such actions and instead were
coming back to help calm the situation, the Court cannot
conclude that they should have not used any force to arrest
Plaintiff in light of the clear possibility, even likelihood,
that he might harm himself or another individual if not
restrained immediately.

Accordingly, the Court concludes as a matter of law that
the undisputed facts show that the Officers' actions from the
beginning of the second encounter up until the point they
initially subdued him by handcuffing him are protected from
liability by the community caretaking doctrine.  Accordingly,
the Court will grant Defendants' Motion for Summary Judgment
regarding Plaintiff's false arrest claims and false imprisonment

claims pursuant to 42 U.S.C. § 1983 and NJCRA to the extent based on the Plaintiff's initial detention.[4]

However, the same cannot be said for the events that followed the initial detention regarding Plaintiff's claims for the use of excessive force.

### b. Excessive Force and Failure to Intervene

In determining whether excessive force was used in effecting an arrest, the Fourth Amendment's "objective reasonableness" test is applied.  Sharrar v. Felsing, 128 F.3d 810, 820-21 (3d Cir. 1997) (citing Graham v. Connor, 490 U.S.

---

[4] The Court will deny without prejudice Defendants' Motion for Summary Judgment regarding Plaintiff's NJCRA and 42 U.S.C. § 1983 claims to the extent based on Plaintiff's alleged false imprisonment after the initial detention to the extent that exists as a standalone claim.  In Defendants' initial papers in support of their Motion for Summary Judgment, Defendants focus on the reasons why the court must dismiss Plaintiff's false arrest claim not Plaintiff's false imprisonment claim.  It is not until the Defendants' reply brief that Defendants argue dismissal of the false imprisonment claim is warranted because "the continued suggestion of any viable 'false arrest; is frivolous and should be explicitly dismissed by this motion." This is because, according to Defendants, false imprisonment claims are "only properly asserted for damages for confinement imposed pursuant to legal process up until the time of trial." (ECF No. 56 at 25.)  "However, it is well-established that new arguments cannot be raised for the first time in reply briefs." Spence v. New Jersey, No. 19-21490 (NLH/KMW), 2021 U.S. Dist. LEXIS 70128, at *12 (D.N.J. Apr. 12, 2021) (quoting Pitman v. Ottehberg, No. 10-2538 (NLH/KMW), 2015 U.S. Dist. LEXIS 4438, (D.N.J. Jan. 14, 2015)).  Accordingly, this "[a]rgument[] raised for the first time in [Defendants'] reply brief will be disregarded." Id.  (quoting Thomas v. Correctional Medical Services, Inc., No. 1:04-cv-3358 (NLH), 2009 U.S. Dist. LEXIS 21762 at *13 (D.N.J. March 17, 2009)).

386, 396 (1989)).  The objective reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Id. (relying on Graham, 490 U.S. at 396; Groman v. Township of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995)).  "Other relevant factors include the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time."  Id.

In order to establish a claim for failure to intervene in another's use of excessive force, a plaintiff must show that: (1) the defendant failed or refused to intervene when a constitutional violation took place in his or her presence or with his or her knowledge; and (2) there was "a realistic and reasonable opportunity to intervene."  Smith v. Mensinger, 293 F.3d 641, 651 (3d Cir. 2002).

Even though the determination of whether an officer acted in an objectively reasonable manner or made a reasonable mistake of law, and is thus entitled to qualified immunity, is a

question of law that is properly answered by the court, not a
jury, the Third Circuit has recognized that a judge should not
decide the objective reasonableness issue until all the material
historical facts are no longer in dispute. Curley v. Klem, 499
F.3d 199, 211, 211 n.12 (3d Cir. 2007). To do this, "[a] judge
may use special jury interrogatories, for instance, to permit
the jury to resolve the disputed facts upon which the court can
then determine, as a matter of law, the ultimate question of
qualified immunity." Id. In other words, "[w]hen the ultimate
question of the objective reasonableness of an officer's
behavior involves tightly intertwined issues of fact and law, it
may be permissible to utilize a jury in an advisory capacity, .
. . but responsibility for answering that ultimate question
remains with the court." Id.

The Court first notes that as found above "[b]ased on
Defendants' knowledge that the Plaintiff [kicked and bit] the
EMT — whether intentional or not — and Plaintiff's resistant to
the EMT's attempts at providing medical care, Defendant[s were]
justified in employing some amount of force to take control of
the situation to prevent Plaintiff from harming others or
himself." Keller v. Crawford, 465 F. Supp. 3d 472, 479 (E.D.
Pa. June 4, 2020); see also Anthony v. Seltzer, 696 F. App'x 79,
82 (3d Cir. 2017) (drawing a distinction between using force to
subdue a noncompliant person having a seizure and using force

once the person was subdued, and holding the latter, but not the former, to be excessive).  Accordingly, in line with this case law and consistent with the Court's previous finding that the community caretaking doctrine protects the Officers up until the time the Officers handcuffed the Plaintiff, the Court will grant Defendants' Motion for Summary Judgment regarding Plaintiff's excessive force claims under 42 U.S.C. § 1983 and NJCRA to the extent based on force applied to subdue and handcuff Plaintiff initially.

However, the same cannot be said for the force applied after Plaintiff was subdued and handcuffed.  Defendants rely heavily on the video evidence to argue that it clearly depicts their version of the encounter with Plaintiff and that the videos support that their use of force was reasonable. Plaintiff, in contrast, argues that the video speaks for itself, supports his version of the events, and it is subject to the review and perception of the jury.  The Court has viewed the video evidence several times, and finds that a jury must watch and assess the footage because a jury could find that it supports the Defendants' version of events rather than the Plaintiff's, or could interpret what it sees to support Plaintiff's account of what occurred.

The following are examples of disputed facts that require a jury's resolution, although there may be many other facts

requiring a jury's consideration:[5]

1. Did Plaintiff intentionally try to kick Officer
   Fanfarillo while Plaintiff was on the edge of the
   ambulance?

2. Did Plaintiff purposefully attempt to disarm Officer
   Snyder while the Officers were attempting to subdue
   Plaintiff?

3. Did Plaintiff purposefully attempt to bite the Officers
   while the Officers were attempting to subdue him?

4. Was Plaintiff repeatedly yelling at the Officers to "die"
   or was Plaintiff repeatedly calling out for his father
   "John" and screaming because of the pain he was
   experiencing and/or because Plaintiff was experiencing or
   recovering from an epileptic seizure?

5. Was Plaintiff continuing to move while the Officers
   applied pressure on his body because he was experiencing
   or recovering from an epileptic seizure and/or because of
   the pain of the Officers' weight applied to his body as
   opposed to Plaintiff resisting arrest?

6. Did Plaintiff continue to pose a threat after his hands

---

[5] The Court provides these examples of jury interrogatories only
to show that disputed facts need to be resolved before the Court
can undertake the qualified immunity analysis. At trial, the
actual special interrogatories submitted to the jury will be
posed by the parties and approved by the Court, and they will
not necessarily be framed as presented here.

were bound by handcuffs?

7. Did Plaintiff continue to pose a threat after Plaintiff's
feet were bound while Plaintiff laid in a prone position
with his hands bound by handcuffs?

8. Did Plaintiff continue to pose a threat before the
ketamine was administered and after he was handcuffed,
after the ketamine was administered, or only after a
certain time had passed?

Because the video could support various outcomes, a jury
must decide which version to believe. Either way it decides, a
jury's assessment of the videos, in combination with the other
evidence, through the use of special interrogatories on the
issues set forth above or perhaps others, must be performed so
that the Court may make the ultimate determination as to whether
Defendants' use of force on Plaintiff was reasonable.[6]

Consequently, because disputed material facts must be
resolved by a jury prior to the Court's determination of whether
Defendants are entitled to qualified immunity, Defendants'

---

[6] This is not a case where even if all of the Plaintiff's claims
are accepted as true, the Officers' actions following the
handcuffing of Plaintiff could be found to be objectively
reasonable. Cf. Feldman v. Community College of Allegheny
(CCAC), 85 F. App'x 821, 826 (3d Cir. 2004) ("[W]e agree with
the District Court's assessment that, even accepting Feldman's
description of the arrest, the force resulted as part of the
struggle and was not excessive in light of Feldman's physical
resistance. The force was reasonable under Groman and fails to
amount to a § 1983 violation.").

Motion for Summary Judgment to dismiss Plaintiff's excessive force claims under 42 U.S.C. § 1983 and NJCRA to the extent based on the force applied after Defendants handcuffed Plaintiff is denied without prejudice.  For similar reasons, the Court will also deny without prejudice Defendants' Motion for Summary Judgment regarding Plaintiff's failure to intervene claims.  At this time, the Court is unable to determine, as a matter of law, the ultimate question of qualified immunity as to Plaintiff's failure to intervene claim, which is dependent on the facts underlying Plaintiff's excessive force claim.  As such, and according to Curley, the Defendants' motion seeking a determination that Defendants are entitled to qualified immunity on Plaintiff's excessive force and failure to intervene claims pursuant to the NJCRA and 42 U.S.C. § 1983 must be denied without prejudice.[7]

---

[7] "Since there is a dispute of material fact concerning the events during the arrest that must be decided by a jury, the Court does not reach the issue of whether the right was clearly established."  Gibson v. Mueller, No. 09-6486, 2012 U.S. Dist. LEXIS 44853, at *38 n.9 (D.N.J. Mar. 29, 2012); see also Curley, 499 F.3d at 225-26 (dissenting opinion) (internal citations omitted) ("[I]f factual disputes relevant to [the step-two] legal analysis do exist, the court will have to postpone making this determination until the jury resolves all the relevant factual disputes, because determining what actually happened is a prerequisite to determining whether the law clearly established that a particular action was permitted or prohibited by the Fourth Amendment under those circumstances. After the jury resolves these relevant fact disputes, presumably through the use of special interrogatories, the court is then capable of deciding whether or not the law clearly permitted or prohibited

### c. Monell and Supervisory Liability

Municipalities and other local government units are among those "persons" to which § 1983 liability applies.  <u>Monell v. New York City Dep't of Social Services</u>, 436 U.S. 658, 690 (1978).  "Local governments, however, cannot be held liable for the actions of their employees solely based on the doctrine of <em>respondeat superior</em>."  <u>Norman</u>, 2017 U.S. Dist. LEXIS 100707, at *29 (citing <u>Monell</u>, 436 U.S. at 691-95; <u>Bielevicz v. Dubinon</u>, 915 F. 2d 845, 849-50 (3d Cir. 1990)).

---

the conduct constituting the constitutional violation.").  The Court notes, however, the significance of <u>Rivas v. City of Passaic</u>, 365 F.3d 181 (3d Cir. 2004) to the present case.  In <u>Rivas</u>, the evidence showed that the defendant officers collectively pressed their body weight into the back of a plaintiff, who was experiencing seizures, while he was handcuffed, had his ankles secured, and laid in a prone position.  This continued until the plaintiff became unconscious and soon thereafter, the paramedics at the scene noticed the plaintiff had stopped breathing.  <u>Id.</u> at 200.  The Third Circuit noted that a reasonable jury could find that the plaintiff "did not present a threat to anyone's safety as he lay in a prone position on the enclosed porch, hands and ankles secured behind his back."  <u>Id.</u>  For these reasons, the Third Circuit concluded "[a]ssuming that [plaintiff] was handcuffed and had his ankles tied at that time, a reasonable jury could find that the continued use of force against [plaintiff] was excessive." <u>Id.</u> Following <u>Rivas</u>, the Third Circuit has recognized "[u]nder the circumstances, where the victim 'did not present a threat to anyone's safety,' we had no hesitation in concluding that the 'continued use of force' made out a violation of the victim's clearly established rights."  <u>Anthony</u>, 696 Fed. App'x at 83 (quoting <u>Rivas</u>, 365 F.3d at 200).  Moreover, "a police officer's duty to intervene to prevent excessive force was well-established by" 2015.  <u>Sanders v. Jersey City</u>, No. 18-1057, 2021 U.S. Dist. LEXIS 78681, *30 (citing <u>Smith v. Mensinger</u>, 293 F.3d 641, 650-51 (3d Cir. 2002); <u>Baker v. Monroe Township</u>, 50 F.3d 1186, 1193 (3d Cir. 1995)).

"Neither Monell v. New York City Dept. of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm." City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986). "If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." Id.; see also Smith v. Gransden, 553 F. App'x 173, 178 (3d Cir. 2014) ("Because we will not disturb the jury's verdict that Frampton is not liable for any constitutional violations, there can accordingly be no derivative municipal claim based on Frampton's actions. Further, to the extent that Smith argues that Camden is nevertheless liable under § 1983 because its unwritten policy caused a constitutional violation through officers on the scene other than Frampton, her argument is similarly unavailing, as it requires proof that a CPD officer on the scene violated Kashon Smith's constitutional rights by being deliberately indifferent to his medical needs. Here, the jury found Smith did not prove any officer violated Kashon Smith's rights and thus, Camden could not be found liable and we will not disturb the District

Court's ruling in favor of Camden.")(internal citations and quotations omitted); Reiff v. Marks, 511 Fed. App'x 220, 222-23 (3d Cir. 2013) (affirming the district court's dismissal of the plaintiff's failure-to-train municipal liability claim against West Reading Borough after a jury trial determined that the defendant officer's use of a TASER on the plaintiff was reasonable use of force because a municipality may not be held liable on a failure-to-train theory when a jury has found that the plaintiff has suffered no constitutional violation).

Moreover, regarding the supervisory liability claim against Chief Fanfarillo, Chief Fanfarillo can only be held liable if there is an actual underlying constitutional violation. Allen v. Eckard, 804 Fed. App'x 123, 127 (3d Cir. Mar. 11, 2020) ("There are several ways to establish supervisory liability under § 1983. However, all of them require a showing that there was an actual constitutional violation at the hands of subordinates.")(citations omitted).

Regarding Plaintiff's Monell and supervisory liability claims against Glassboro and Chief Fanfarillo, the Court will bifurcate these claims from Plaintiff's claims against the Officers. See Fed. R. Civ. P. 42(b) ("For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. When ordering

a separate trial, the court must preserve any federal right to a jury trial."). If, after a jury has answered its special interrogatories as to Plaintiff's claims against the Officers, the Court concludes that the Officers did not violate Plaintiff's constitutional rights and they are entitled to qualified immunity, the principle announced in Heller and applied by the Third Circuit could warrant the dismissal of Plaintiff's municipal and supervisory liability claims. At a minimum, it would be a waste of judicial resources to assess Plaintiff's Monell and supervisory claims now if such claims ultimately are not viable based on how the jury assesses the evidence of the Officers' alleged wrongdoing.

Accordingly, the Court will deny without prejudice and consider Glassboro and Chief Fanfarillo's Motion for Summary Judgment on Plaintiff's Monell and supervisory liability claims against them after the jury has resolved the disputed facts and the Court has determined whether the Officers are entitled to qualified immunity.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted, in part, and denied, in part. An appropriate Order will be entered.

Date: July 12, 2021            s/ Noel L. Hillman
At Camden, New Jersey       NOEL L. HILLMAN, U.S.D.J.